**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **TRINA CONGRESS**, | |
| Plaintiff, | |
| v. | Case No. 17-cv-907 (CRC) |
| **DISTRICT OF COLUMBIA**, | |
| Defendant. | |

## MEMORANDUM OPINION

This employment discrimination case rests on an unusual set of facts.  A 2013 District of Columbia Public Schools ("DCPS") investigation found that a school employee, Trina Congress, improperly claimed D.C. residency when registering her daughter at a D.C. public high school. Congress was charged non-resident tuition for the relevant enrollment period as a result of the transgression but continued in her job as a teacher's aide at a local middle school.  Some nineteen months later, soon after Congress complained to school system officials that her principal had unfairly denied her requests for leave stemming from a purported disability, the residency fraud investigation was picked back up by a different office within DCPS.  This second inquiry, which found a longer period of fraud, culminated in Congress's termination.  She sued.  Following responsive motions practice and discovery, the District has moved for summary judgment on the two remaining claims in the case: discrimination and retaliation under the federal Rehabilitation Act.

The Court will grant summary judgment for the District on Congress's discrimination claim but not on her retaliation claim.  As to the former, the record shows that DCPS based its decision to terminate Congress on its well-founded belief that she engaged in multiple  instances of residency fraud and there is insufficient record evidence to suggest that the District's

explanation for the termination was a pretext for disability discrimination.  As to Congress's retaliation claim, DCPS's decision to re-investigate the residency fraud allegations against Congress after a nineteen-month period of inactivity was an adverse employment action because it threatened serious consequences and led to Congress's termination.  While the District maintains that the extended lapse between the two investigations resulted from turnover of personnel within DCPS, evidence in the record permits an inference that later investigation was put into motion in retaliation for Congress's recent complaints about her principal's hostility towards her requests for disability-related accommodations.  Congress may therefore present her retaliation claim to a jury.

## I.    Background

### A.   Factual Background

#### 1.   *Congress's hiring, transfer, and reported interactions with Principal Zaki regarding her disability*

DCPS hired Ms. Congress as special education teacher's aide at Kramer Middle School ("Kramer") in December 2011.  Def.'s Statement of Material Facts ¶1; Congress Dep. at 13.  As part of the hiring process, Congress submitted an I-9 employment eligibility form and a copy of her driver's license which both listed a Maryland home address.  Def.'s Mem. Supp. Summ. J. ("MSJ") Ex. 4, 5.

In 2012, Congress was transferred to Kelly Miller Middle School ("Kelly Miller"), where Abdullah Zaki served as Principal.  Def.'s Statement of Material Facts ¶7; see Pl.'s Statement of Material Facts ¶22.  Congress testified in her deposition that she met with Zaki shortly after starting.  Congress Dep. at 26:19–30:9.  In that meeting, Congress, who suffers from nerve damage stemming from a car accident, claims to have informed Zaki of various impairments arising from her condition, including difficulty climbing stairs and limited mobility.  Id. at 26:2–

27:22, 28:18–29:4.  She also reportedly expressed concerns to Zaki about her capacity to physically intervene while working with emotionally disturbed students and about the improper use of the handicap parking space at Kelly Miller by non-disabled employees.  Id. at 36:3–22. Congress recounted several additional meetings with Zaki during her tenure at Kelly Miller concerning her disabilities and need for accommodations.  Id. at 34:20–35:15.  She also recalled that Zaki denied numerous written leave requests that she submitted to attend doctor's appointments, although the requests themselves are not in the present summary judgment record. See id. at 102:14–104:22.  Congress further testified that Zaki frequently disparaged her leave requests, noting once, for example, that he "did [not] have room for people like [Congress]."  Id. at 139:19–140:10.  Congress understood these statements to be references to her medical conditions.  Id. at 140:7–10.

### 2.  *Congress's enrollment of her daughter in a District public school*

In early 2012, Congress and her family found themselves in a dispute with a woman named Rita Whatley.  While the precise nature of the dust-up is not clear to the Court, it was serious enough that Congress's daughter, W.S., was attacked and required hospitalization.  Id. at 62:1–6.  On February 23, 2012, Congress enrolled W.S. as a student at Anacostia Senior High School ("Anacostia" or "Anacostia High"), a District public school.  See Def.'s MSJ Ex. 7 at 1. Congress explains that she did so in order to protect her daughter from Whatley.  See, e.g., Def.'s MSJ Ex. 22 at 6.  Congress re-enrolled W.S. at Anacostia in September 2012 for the following schoolyear.  Def.'s MSJ Ex. 9 at 1.  During the September enrollment process, Congress submitted several pieces of documentation, including a signed "Annual Student Enrollment Profile," which listed Congress's sister's D.C. address as her own.  Id.  At another point during the September enrollment, an Anacostia official completed a "DC Residency Verification Form"

which also bore Congress's sister's D.C. address and indicated that Congress had submitted a pay stub reflecting that address. Def.'s MSJ. Ex. 11 at 1. The pay stub in fact belonged to Congress's sister. See Pl.'s Opp. at 14. Later that month, Congress filed for a temporary restraining order against Whatley, which listed Congress's home address as Oxon Hill, Maryland. Def.'s MSJ Ex. 10 at 1.

### 3. *The initial residency fraud investigation*

In December 2012, Whatley lodged a complaint with DCPS's Student Residency Office—which investigates residency fraud by parents of children enrolled in District public schools, Wynn Dep. at 10:6–12:7, 13:20–14:14—claiming that Congress was not a D.C. resident. Def.'s MSJ Ex. 12 at 1–2. Investigator Resa Wynn received the complaint in early January 2013 and informed both Congress and Zaki of the investigation. See Def.'s MSJ Ex. 17 at 1–2; Pl.'s Opp. Ex. G. at 1; Congress Dep. at 57:18–21. During an ensuing interview with Wynn, Congress admitted that she received a housing subsidy from Prince George's County in Maryland which required residency in that county. Def.'s MSJ Ex. 8 at 18:30–19:29; Def.'s Statement of Material Facts ¶24; cf. Pl.'s Statement of Material Facts ¶24. As a result of her investigation, Wynn concluded that Congress and her daughter were not District residents between August 2012 and February 2013. Def.'s MSJ Ex. 19 at 1. Upon receiving the investigation findings, Congress promptly removed her daughter from Anacostia. Id.; Def.'s MSJ Ex. 7 at 1. DCPS subsequently issued Congress a letter assessing the amount of nonresident tuition owed to the District at $6,077.00. Def.'s MSJ Ex. 19 at 1.

Soon after receiving Whatley's complaint against Congress in January 2013, Wynn brought the complaint to the attention of officials in DCPS's Labor Management and Employee Relations ("LMER") office, which handles misconduct complaints against teachers and certain

other categories of DCPS employees.  Def.'s MSJ Ex. 15 at 1; Wynn Dep. at 14:20–15:4, 29:3–17.  Anthony Hinnant, the LMER official who assigned investigations at that time, instructed lead investigator Wanda Malloy to "get with [Wynn]" because LMER "may want to open an investigation on [Congress]."  Def.'s MSJ Ex. 16 at 1.  According to Wynn, however, Malloy never followed up with her about the matter and no further action was taken at that time.  Wynn Dep. at 30:20–31:9, 49:7–12.  Malloy subsequently left the office and DCPS.  Id. at 28:18–22, 31:10–32:7.  Her position was filled by Daniel Ellis until July 2014, at which point Robert Thomas took over.  Thomas Dep. at 11:2–13:2.

### 4.  *The LMER investigation*

Meanwhile, Congress continued working as a special education teacher's aide at Kelly Miller.  In early September 2014, Congress submitted a written complaint to LMER alleging that Principal Zaki was retaliating against her, although the version of the complaint that Congress included as an exhibit to her summary judgment motion does not provide details as to the nature of the alleged retaliation.  Pl.'s Opp. Ex. L at 1.  LMER representative Erica Smith emailed with Congress regarding her complaints, asking whether Congress had received any more "information from [Zaki] about why he was not approving" one of her leave requests.  Pl.'s' Opp. Ex. M at 1.  On the afternoon of September 17, 2014, Congress replied that she was having "personal problem[s]" with Zaki.  Id.  The reply raised concerns that Congress was being asked to cover other teachers' classes, apparently in violation of instructions Congress had received from LMER.  Id.  Approximately two hours later, Wynn, the DCPS investigator who conducted the 2013 residency fraud investigation, sent an email to Thomas forwarding her original January 2013 correspondence to LMER regarding Whatley's complaint against Congress, noting "[h]ere is the case I was referring to."  Def.'s MSJ Ex. 21 at 1.  Wynn added that she did not "think it

was ever investigated" and that she had "whatever additional information is needed in the file." Id. LMER eventually assigned Steven Lee to conduct an investigation. See Def.'s MSJ Ex. 23.

On October 9, 2014 Congress participated in a mediation session with Smith and Zaki regarding her complaints about Zaki, including his alleged disregard for her disabilities. See Congress Dep. at 127:1–128:14, 131:18–132:10. Congress testified in her deposition that Zaki responded to her concerns by announcing in the mediation that she should be investigated for residency fraud. Id. at 128:14–128:18. In an email memorializing the mediation session, Smith noted that Congress complained of a "reprimand that she received for leaving early" and that Zaki indicated that Congress "request[s] time off a lot." Def.'s Reply Ex. 2 at 2.

On November 10, 2014, LMER investigator Lee interviewed Congress regarding the residency fraud matter in the presence of Thomas and a union representative. See Def.'s MSJ Ex. 22 at 3. Lee's summary of the interview, prepared as part of his investigation, recounts statements by Congress that "she used her sister's address . . . to enroll her daughter [at Anacostia] on February 23, 2012;" that she had "signed . . . [an] Annual Student Enrollment document stating that she and her daughter were bonafide District of Columbia residents;" that she "admitted that she and her daughter did not actually reside in the District at any time;" and that she was "not aware of the fact that she was in violation of any D.C. Regulation since her daughter lived with her at their actual address [in Maryland] on the weekends and stayed with [Congress's] sister during the week." Id. Congress also provided Lee a signed statement claiming that she enrolled her daughter at Anacostia because of "stalking" and "threats made on [Congress and her daughter's lives]" by Whatley. Id. at 5–6. Congress's written statement also noted that "Zaki threatened [her] with [the residency fraud] claim in a meeting with LMER [representative] Smith" and that Congress "had no idea [she] was doing anything wrong" by

6

enrolling her daughter at Anacostia.  Id. at 5.  Congress further indicated in the statement that she

withdrew her daughter as soon as she was told by Wynn that she was violating the residency

rule.  Id. at 6.  In his November 2014 Investigative Report, Lee summarized the above evidence

before concluding that Congress had not been a resident of the District from February 2012 to

February 2013, the entire period Congress's daughter was enrolled at Anacostia.  Id. at 4.

      *5.  The termination decision*

      In mid-April 2015, DCPS completed a Disciplinary Action Recommendation Memo

which analyzed both LMER's investigation findings and Congress's past work performance.[1]

The memo determined, pursuant to a 12-factor analysis derived from Douglas v. Veterans

Admin., 5 M.S.P.B. 313, 332–33 (1981),[2] that termination was the appropriate sanction.  See

Def.'s MSJ Ex. 25 at 1–3.  The memo found that Congress engaged in two separate violations of

DCPS's residency policy by enrolling her daughter at Anacostia in February 2012 and again in

September 2012.  See id. at 1.  It further determined that Congress "manipulated" the residency

verification process to enroll her daughter.  Id.  And it noted that while DCPS historically

terminates employees who engage in residency fraud, it "considered diverting from past practice

and issuing a lesser sanction" in light of Congress's explanation that she enrolled her daughter at

---

[1] In addition to the Director of LMER, the memo was signed by the Chief of Staff in DCPS's Office of Human Capital (OHC), and a Central Office Effectiveness (COE) Specialist.  Def.'s MSJ. Ex. 25 at 3.

[2] In Douglas the Merit Systems Protection Board identified twelve factors that are "generally recognized as relevant" in determining the sufficiency of an employment penalty.  5 M.S.P.B. at 331–32.  Those factors are: (1) the seriousness of the offense, (2) the employee's job level and type of employment (including any special duties derived from the employee's supervisory or fiduciary status), (3) the employee's past disciplinary record, (4) the employee's past work record, (5) the effect of the offense on the employee's ability to perform their work (and their supervisor's confidence in the same), (6) the consistency of the penalty with those imposed in similar situations, (7) the consistency of the penalty with any internal schedule of penalties, (8) the public notoriety of the offense, (9) the extent to which the employee was on notice regarding the rule violation, (10) the potential for the employee's rehabilitation, (11) mitigating circumstances, and (12) the adequacy and effectiveness of alternative sanctions to deter similar conduct.  Id. at 332.  The District analyzed Congress's conduct under each factor.  Def.'s MSJ Ex. 25 at 1–3.

Anacostia out of concerns for her safety.  Id. at 2–3.  Nonetheless, because Congress had falsely

certified the information on the Annual Student Enrollment Profile, because the safety concerns

did "not explain [Congress's] enrolling her daughter at Anacostia the second time, in September

2012, over six months after the first time," and because Congress had "ample time to seek out

alternative options, such as other schools in her city of residence," the memo concluded that

"DCPS cannot justify [Congress] intentionally circumventing the rules" and thus considered

"this case akin to other cases of residency fraud."  Id. at 3.  Explaining that DCPS must be

"consistent in its discipline," the memo recommended termination.  Id.  Consistent with that

recommendation, on April 21, 2015, the Director of LMER sent Congress a Notice of

Termination informing her that she would be fired on the grounds that she had violated DCPS's

residency requirement by enrolling her daughter at Anacostia and falsely listing a D.C. residence

on the Annual Student Enrollment Profile.  Def.'s MSJ Ex. 26 at 1.  Congress's termination

became effective May 7, 2015.  Id.

  B.  Procedural History

   In July 2015, Congress filed a charge of discrimination against the District of Columbia

with the Equal Employment Opportunity Commission ("EEOC") and the D.C. Office of Human

Rights.  After receiving a right to sue letter from the EEOC, Congress brought this action under

the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and the D.C. Human

Rights Act.  Her original complaint raised claims of discrimination, retaliation, and hostile work

environment.  The District filed a motion to dismiss, which the Court granted as to all claims

save the hostile work environment claim under the Rehabilitation Act.  Congress v. District of

Columbia, 277 F. Supp. 3d 82, 86, 90 (D.D.C. 2017) (Cooper, J.) ("Congress I").  After securing

new counsel, Congress amended her complaint, again raising claims of discrimination,

retaliation, and hostile work environment, and the District again moved to dismiss.  The Court

granted the motion in part but permitted Congress's claims of discrimination and retaliation

under the Rehabilitation Act to go forward.  Congress v. District of Columbia, 324 F. Supp. 3d

164, 175 (D.D.C. 2018) (Cooper, J.) ("Congress II").  The parties proceeded to discovery.

Discovery now complete, the District moves for summary judgment.

## II.   Legal Standards

The Court must grant summary judgment where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The District, as the movant, bears the burden of demonstrating the

"absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986); Fed. R. Civ. P. 56(c)(1).  In making that determination, the Court must "view the facts

and draw reasonable inferences 'in the light most favorable to the [non-moving] party . . . .'"

Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654,

655 (1962) (per curiam)).  The non-movant may not, however, rely on "mere allegations" or

conclusory statements to defeat a motion for summary judgment.  Veitch v. England, 471 F.3d

124, 134 (D.C. Cir. 2006).

Rehabilitation Act claims follow the familiar three-step framework established in

McDonnell Douglas v. Green, 411 U.S. 792 (1973) in which plaintiffs bear the initial burden of

making out a *prima facie* case of retaliation or discrimination.  See, e.g., Kersey v. Washington

Metro. Area Transit Auth., 586 F.3d 13, 16–17 (D.C. Cir. 2009).  However, at summary

judgment, once the employer offers a "legitimate, non-discriminatory [or non-retaliatory] reason

for the challenged decision, . . . the question whether the employee actually made out a *prima*

*facie* case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'"  Brady

v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502, 510–511 (1993) and Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 143 (2000)).  At that point, the *prima facie* case is "a largely unnecessary sideshow"

and district courts "should not [] decide whether the plaintiff actually made out a *prima facie*

case."  Id. (internal quotation marks and citation omitted).  Instead, "in considering an

employer's motion for summary judgment . . . the district court must resolve one central

question: Has the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and the employer

intentionally discriminated [or retaliated] against the employee . . . ?"  Id.; see also, e.g., Kersey,

586 F.3d at 16–17 (explaining that, in the context of a motion for summary judgment under the

Rehabilitation Act, after the defendant provides a legitimate, non-discriminatory reason for the

challenged action, "the sole remaining issue is discrimination or retaliation *vel non*" and that "to

survive summary judgment the plaintiff must show that a reasonable jury could conclude from

all of the evidence that the adverse employment decision was made for a discriminatory or

retaliatory reason" (cleaned up)).  This focus, however, does not mean that evidence bearing on

the *prima facie* case is irrelevant to the ultimate question of discrimination.  After all, plaintiffs

will be hard pressed to show that discrimination lay behind an adverse action where, *e.g.*, the

plaintiff never suffered a legally cognizable adverse action, or the employer was truly unaware of

the characteristic that was the supposed source of discriminatory animus.  Instead, upon an

employer's motion for summary judgment, the court is to consider the question of discrimination

or retaliation as a whole; that is, did the plaintiff raise a genuine issue of material fact that the

employer took an adverse action against them on the basis of some protected characteristic or

activity rather than for the employer's proffered legitimate reason.  See Kersey, 586 F.3d at 16–17.

### III.  Analysis

The District contends that Congress has not made out a *prima facie* case for either her discrimination or retaliation claim.  It also offers legitimate, non-discriminatory reasons for the adverse actions it took against her.  As to its decision to terminate Congress, the District cites its investigative findings regarding her daughter's enrollment at Anacostia High.  As for LMER's decision to commence investigating the residency fraud claims in 2014, some nineteen months after they were brought to that office's attention, the District contends that the delay resulted from employee turnover in LMER that caused the matter simply to fall through the cracks.

Following the approach outlined above, because the District has offered legitimate, non-discriminatory reasons for its actions, the Court will primarily focus on whether the District's explanations could be construed as pretextual and will only address the District's arguments on the *prima facie* case as they bear on the ultimate question of discrimination.  The Court finds that Congress failed to raise a genuine issue of material fact as to the DCPS's honest and reasonable belief that Congress's residency fraud justified her termination and will thus grant summary judgment to the District on Congress's discrimination claim.  However, the Court finds that Congress has presented sufficient evidence to raise a genuine question of fact as to whether LMER's decision to commence investigating the residence fraud allegations in 2014, following a nineteen-month period of inactivity, resulted from her complaints about Principal Zaki's handling of issues related to her disability.  A jury could thus find that the District's alternative explanation—employee turnover and lack of communication within LMER—is pretextual.  The Court will, accordingly, deny summary judgment on Congress's retaliation claim.

A.  Count III: Termination Because of Disability

Count III of the amended complaint alleges that the District terminated Congress because of her disability.  The Rehabilitation Act makes it unlawful for government employers to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (ADA discrimination provision); see 29 U.S.C. § 791(f) (incorporating ADA standards in 42 U.S.C. § 12111 *et seq.*); Savage v. Azar, 301 F. Supp. 3d 114, 123 (D.D.C. 2018) (Cooper, J.), aff'd, No. 18-5287, 2020 WL 1919639 (D.C. Cir. Apr. 8, 2020) (recognizing the same).

As described above, Congress's discriminatory discharge claim is governed by McDonnell Douglas's familiar three-step framework.  See Savage, 301 F. Supp. 3d at 123 (applying McDonnell Douglas to analyze a Rehabilitation Act discrimination claim).  But, where the employer has offered a legitimate nondiscriminatory reason for the challenged action,  the court "*should not* [] decide whether the plaintiff actually made out a prima facie case" and should instead focus attention on the question of whether a reasonable jury could infer pretext from the record at summary judgment.  Figueroa v. Pompeo, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (quoting Brady, 520 F.3d at 494) (emphasis original); see also id. at 1086–88 (describing the showing required of employers at summary judgment to demonstrate the existence of a legitimate nondiscriminatory reason).

The District nonetheless challenges Congress's *prima facie* case by arguing both that DCPS lacked knowledge of Congress's disability and that Congress has failed to show that the DCPS was motivated solely by discriminatory animus in firing her.  The District also provides a legitimate, non-discriminatory reason for Congress's termination: DCPS's findings that Congress

committed residency fraud.  As such, to survive the District's motion for summary judgment,

Congress must show that a reasonable jury could conclude that the District's residency fraud

justification for her termination was pretextual and that the District actually terminated her

because of her disability.  See Morris, 825 F.3d at 668.  Although the Court thus need not

expressly address the *prima facie* case, because the issues raised by the District's arguments on

that topic bear on the ultimate issue of whether the District engaged in discrimination, the Court

addresses them below.

####### 1. *Notification*

The Rehabilitation Act protects individuals who have "a physical or mental impairment

that substantially limits one or more major life activities" as well as those "regarded as having

such impairment."  42 U.S.C. § 12102(1)(A), (C) (ADA definition of disability); 29 U.S.C. §

791(f) (incorporating ADA standards).  The District maintains that DCPS was not aware of

Congress's disability and therefore it could not have fired her "because" of it.  Cf. Mitchell v.

Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) ("[t]he causal connection component of the *prima*

*facie* case may be established by showing that the employer had knowledge of the employee's

protected activity, and that the adverse personnel action took place shortly after that activity.").

DCPS was in the dark, the District argues, because Congress failed to submit written notification

to DCPS of any physical disability.  Def.'s Statement of Material Facts ¶¶36, 37.  But, the

District cites no authority for the proposition, and the Court has found none, that an employee

must provide *written* notice of a disability to her employer.  Cf. Floyd v. Lee, 85 F. Supp. 3d

482, 506 (D.D.C. 2015) (noting that, under the Rehabilitation Act, "requests for reasonable

accommodations do not need to be in writing" to trigger an employer's duty to respond (quoting

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)).  Here, Congress testified

that she met with Principal Zaki shortly after starting at Kelly Miller to "discuss[] her health conditions" and informed him that "because of the limitations with [her] body," there were certain "things that [she] was not capable of doing," including working in a classroom with "emotionally disturbed" students.  Congress Dep. at 26:2–27:15.  If this testimony is credited, it is sufficient to have put Zaki (and DCPS) on notice that Congress had a physical disability.

In any case, there is also at least some written evidence in the record permitting a reasonable jury to find that the DCPS was aware of Congress's impairments.  For instance, Congress's email exchange with LMER representative Smith references Congress's difficulty obtaining leave from Zaki.  See Pl.'s Opp. Ex. M at 1 (email to Smith); Congress Dep. at 102:14–104:22 (describing issues receiving leave necessitated by her disability).  And Smith's email to Congress and Zaki following their October 2014 mediation notes that Zaki's denial of leave requests was a central topic of discussion.  Def.'s Reply Ex. 2 at 1–2.

The record thus reflects a genuine dispute as to whether DCPS knew of Congress's impairments before it fired her.  See Steele v. Mattis, 899 F.3d 943, 950 (D.C. Cir. 2018) ("[A]t the summary judgment stage, [a] 'he said, she said' credibility determination must be resolved in favor of [the non-movant].").

### 2.   Pretext and causation

To successfully mount a Rehabilitation Act discrimination claim, a plaintiff must show, among other things, that "[s]he has suffered an adverse employment action solely because of the disability."  Butler v. Washington Metro. Area Transit Auth., 275 F. Supp. 3d 70, 81 (D.D.C. 2017) (citing Barth v. Gelb, 2 F.3d 1180, 1186 (D.C. Cir. 1993)) (Cooper, J.); accord 29 U.S.C. § 794(a).  Courts in this Circuit have rejected "a motivating factor test" for Rehabilitation Act intentional discrimination or retaliation claims, instead interpreting the statutory phrase "solely

by reason" to require that plaintiffs show "but for" causation.  Williams v. Donovan, 219 F.
Supp. 3d 167, 173 (D.D.C. 2016); see also, e.g., Gard v. U.S. Dep't of Educ., 752 F. Supp. 2d 30,
35–36 (D.D.C. 2010), aff'd, No. 11-5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011) (per
curiam)); Brett v. Brennan, 299 F. Supp. 3d 63, 72 (D.D.C. 2018); Hall v. Washington
Metropolitan Area Transit Authority, No. CV 19-1800 (BAH), 2020 WL 5878032, at *9 (D.D.C.
Oct. 2, 2020).  Under that "but for" standard, the employee's disability must be "the 'reason' that
the employer decided to act."  Hall, 2020 WL 5878032, at *9 (quoting Gross v. FBL Fin. Servs.,
Inc., 557 U.S. 167, 176 (2009)); see also Bostock v. Clayton County, 140 S. Ct. 1731, 1739
(2020) (noting that the word "solely" in antidiscrimination statutes typically "indicate[s] that
actions taken 'because of' the confluence of multiple factors do not violate the law").

 The District contends that it could not have fired Congress "solely by reason" of her
disability because its legitimate and non-discriminatory reason for her firing—the 2014
residency fraud findings—provided an independent and sufficient reason to terminate her.
Congress retorts that the residency fraud findings were merely a pretext for her firing because
DCPS did not initially terminate her after the first iteration of the investigation in 2013, and that
the renewed 2014 investigation itself was so lacking in support as to raise an inference of pretext.
The District has the better of the argument.

 When a plaintiff challenges an employer's assertion that facts found during an internal
investigation justified an adverse action, the central inquiry is whether the defendant "honestly
and reasonably believed" the purported grounds for the adverse action.  Brady, 520 F.3d at 496.
A plaintiff may show that an employer did not "honestly and reasonably" believe a cited reason
by casting doubt on the objective validity the employer's explanation.  See George v. Leavitt,
407 F.3d 405, 415 (D.C. Cir. 2005) (noting that "the fact that a proffered reason is objectively

false may undermine an employer's professed honest belief in that reason, but this is not always so"). An employee may also undermine the employer's stated reason through a variety of evidentiary sources, including "the employer's better treatment of similarly situated employees outside [her] protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing Brady, 520 F.3d at 495 & n.3).

### a. Initial failure to terminate

Congress first argues that the District acted inconsistently in not taking any employment action against her after the 2013 residency fraud investigation while subsequently citing residency fraud as grounds meriting her termination in 2015. Congress insists that the 2013 investigation concluded with a finding that, apart from requiring her to withdraw her daughter from Anacostia and pay non-resident tuition for the relevant enrollment period, no further action by DCPS was warranted. Transcript of Motion for Summary Judgment Hearing ("MSJ Hearing"), 24:5–24:11. On this point, Congress testified in her deposition that she received verbal assurances that no further actions would be taken against her. Congress Dep. at 58:10–16. In Congress's telling, DCPS concluded the residency fraud investigation without termination in 2013, then unjustifiably re-adjudicated the issue in 2014 and found that termination was the appropriate sanction. The disparate treatment of these two similar findings, Congress asserts, casts doubt on the honesty and reasonableness of DCPS's belief in residency fraud as sufficient grounds for termination.

The District responds that the initial inquiry conducted by DCPS investigator Resa Wynn and the subsequent investigation by DCPS's LMER division were two different investigations undertaken for different purposes.  <u>See</u> Def.'s MSJ at 2–4; MSJ Hearing at 5:3–5:19.  It explains that the Wynn investigation sought to determine Congress's residency status in her capacity as a *parent* and was conducted under the auspices of DCPS's Student Residency Office, while the LMER investigation was initiated because of Congress's status as a DCPS *employee*.  <u>See</u> Def.'s MSJ at 2–3; MSJ Hearing at 5:3–5:19.  The District notes that while Wynn's investigation indeed concluded in 2013 with a finding that Congress had improperly enrolled her daughter in a District public school, the LMER investigation had not even started, let alone reached a conclusion, when Wynn made her findings.  <u>See</u> Def.'s MSJ at 2–4; Def.'s Reply at 6–7; MSJ Hearing at 5:3–5:19, 7:12–8:4.  Instead, the District suggests that initiation of the LMER investigation had been delayed due to administrative turnover within that office, and that it properly commenced once the staffing issues were resolved.  <u>See</u> Def.'s MSJ at 2–4; MSJ Hearing at 5:3–5:19.

While the District's contention that the delay in LMER's investigation was the innocent consequence of personnel turnover will be addressed below, <u>see</u> Section III.B.3, the present record clearly supports the District's position that LMER's investigation was distinct from Wynn's and did not conclude in 2013.  Wynn herself testified that the LMER investigator originally assigned to the case never contacted her in 2013 to discuss the case or take further investigative steps, despite being asked to do so by an LMER supervisor.  Wynn Dep. at 30:20–31:9; Def.'s MSJ Ex. 16 at 1.  Further supporting the District's view that the two investigations were distinct, Wynn's letter to Congress informing her of the residency fraud investigation stated that Congress was "currently under investigation by the DC Public Schools (DCPS) Student

17

Residency Office," and made no mention of LMER or Congress's status as a District employee. Def.'s MSJ Ex. 17 at 1–2.  And DCPS's letter to Congress informing her of the findings of Wynn's investigation and requiring her to pay non-resident tuition, which is the only documentary evidence in the record of the conclusion of either investigation in 2013, similarly bears the heading of the Student Residency Office, has no reference to LMER, and makes no mention of Congress's status as a District employee.  Def.'s MSJ. Ex. 19 at 1.  Further, as Wynn explained, her investigative ambit did not extend to misconduct by direct school employees like Congress but was instead restricted to misconduct by non-union employees, such as principals or central office employees, as well as residency fraud by parents (regardless of their status as employees).  See Wynn Dep. at 11:13–19, 12:3–7, 13:20–14:14.[3]  As such, the Student Residency Office appears to have investigated Congress only because she was a parent of a child enrolled in a District school.  Cf. id. at 16:1–13 (noting that Wynn had notified the school at which W.S. was enrolled of the outcome of the investigation but not, initially, Congress's supervisor).  By contrast, LMER investigates instances of employee misconduct by school employees like Congress.  Id. at 28:6–29:17.

The Court therefore concludes that no reasonable jury could find that the LMER investigation ended in 2013.  The 2013 investigation was not conducted by LMER and thus did not carry the possibility of termination because it inquired only into Congress's conduct as a

---

[3] Congress did testify that she received verbal assurances from Wynn that "no other penalty or reprimand would be formed against [her]" as a result of the residency fraud investigation after withdrawing her daughter from Anacostia.  Congress Dep. at 58:10–16.  But Congress did not say that she received such assurances from anyone in LMER or anyone with authority to investigate misconduct by DCPS employees like Congress.  See id. at 58:10–16.  Even if Wynn told Congress that no further action would be taken, and Congress took that to encompass employee misconduct investigations for which Wynn was not responsible, there is no evidence that the District or, as relevant here, LMER made any such determination.  In fact, as explained above, there is significant evidence to the contrary.  Wynn Dep. at 30:20–31:9; Def.'s MSJ Ex. 16 at 1.

parent and not as an employee.  Congress's arguments regarding the District's supposed about-face from its 2013 "decision" not to terminate her for residency fraud are therefore misplaced.

> b.  The conduct of the 2014 investigation

Congress next identifies various purported deficiencies in the 2014 LMER investigation that, in her view, demonstrate pretext in the termination decision.  First, Congress argues that, while the initial investigation determined that Congress had improperly enrolled her daughter at Anacostia from August 2012 to February 2013, the LMER investigation found that the period began earlier, in February 2012.  Congress insists that these findings are inconsistent and unexplained, and therefore suggest pretext.  Second, Congress faults the termination decision for erroneously accusing her of signing a false statement attesting to her District residency, insisting instead that the form in question was signed by an Anacostia High official.

Beginning with the purportedly inconsistent results of the two investigations,  Congress is correct that the initial investigation found residency fraud only from August 2012 to February 2013 (when Congress pulled her daughter from Anacostia), see Def.'s MSJ Ex. 19 at 1, while the subsequent one found that the fraud occurred from February 2012 to February 2013, see Def.'s MSJ Ex. 25 at 1–3.  Congress argues that the inconsistency cannot be explained based on the materials underlying the second determination.  She is mistaken.  The investigative summary prepared during the 2014 investigation memorializes Congress's interview by LMER investigator Lee, during which she "stated that she had used her sister's address . . . to enroll her daughter on February 23, 2012."  Def.'s MSJ Ex. 22 at 3.  The summary goes on to state that "Congress admitted that she and her daughter did not actually reside in the District at any time."

Id. at 3.[4]  Congress argues that Lee was unable to recall the basis for the differing conclusions in his deposition, but Lee was clear that Congress stated in the interview that she had lived in Maryland from February 2012 to February 2013.  Lee Dep at 38:18–38:22.[5]  That statement, along with the others included in the investigative summary, support Lee's conclusion that Congress's residency fraud spanned from February 2012 to February 2013.

Even if Congress's characterization of Lee's testimony were accurate, the question at this stage is what the evidence discloses about the honesty and reasonableness of her employer's belief in the conclusions of the LMER investigation.  See Brady, 520 F.3d at 496.  And it is clear from Lee's investigation summary that he based his determination of residency fraud on his interview with Congress.  Def.'s MSJ Ex. 25 at 1–3.  As such, Lee's subsequent inability to recall his justification for the differing result does not provide a reason to doubt the honesty and reasonableness of DCPS's belief that Lee's investigation determined that Congress had committed residency fraud at the time of her termination.  Ultimately, then, Congress overlooks the most obvious reason for the differing outcomes between the 2013 and 2014 investigations, namely, her employer's belief in Lee's summary of her statements.

Congress also misses the mark in arguing that DCPS's Disciplinary Action Recommendation Memo improperly relied on a DC Residency Verification Form that was completed by an Anacostia High official and does not bear her signature.  See Pl.'s Opp. at 3.

_____

[4] While the document notes that "Congress explained that she was not aware of the fact that she was in violation of any D.C. Regulation since her daughter lived with her at their [Maryland] residence . . . on the weekends and stayed with her sister during the week while she attended Anacostia High School," Congress signed a form which listed her residence in the District in September 2012.  See Def.'s MSJ. Ex. 22 at 3.

[5] Nor was there any bright-line policy requiring further documentation of the statements.  See Thomas Dep. at 37:6–17 (noting that practices around memorializing statements during investigations "varie[d]" depending on the case).

While she may not have signed or submitted the form in question, the Disciplinary Action Recommendation Memo does not rely on her signature on that form, but rather a different form that she signed and dated on September 5, 2012.  See Def.'s MSJ Ex. 25 at 3.  In that "Annual Student Enrollment Profile," Congress listed her residence as her sister's address in the District. Def.'s MSJ. Ex. 9.  And, immediately above the line bearing her signature, the form states that the signatory "certif[ies] that the information provided above is accurate" and "understand[s] that providing false information for purposes of defrauding the government is punishable by law." Id.  It was this statement that the Disciplinary Action Recommendation Memo and Termination Notice both cited as grounds for Congress's termination.  See Def.'s MSJ Ex. 25 at 3; Def.'s MSJ Ex. 26 at 1–2.

While Congress is correct that the Disciplinary Action Recommendation Memo refers to the DC Residency Verification Form, see Def.'s MSJ Ex. 25 at 3, it does not do so in a manner suggesting pretext.  The DC Residency Verification Form contains a similar certification paragraph as that in the Annual Student Enrollment Profile described above.  Def.'s MSJ Ex. 22 at 10.  That paragraph outlines the consequences to the signatory of falsifying any statement on the form.  And, as Congress correctly notes, the DC Residency Verification Form appears to bear a signature only from a school official (and not Congress).  See id.  However, that form also notes that "any person, including any District of Columbia public school . . . official, who knowingly *supplies* false information to a public official in connection with student residency verification shall be subject to charges of tuition retroactively . . ."  Id. (emphasis added).  The Disciplinary Action Recommendation Memo concludes that Congress falsified the DC Residency Verification Form by submitting her sister's pay stub as proof of residency, but it does not state that she signed or endorsed the warnings on that form.  See Def.'s MSJ Ex. 25 at 3.

Rather, it faults Congress for signing and endorsing the warnings on the Annual Student Enrollment Profile.  See id.  Ultimately, then, the Disciplinary Action Recommendation Memo acknowledges this difference between the Annual Student Enrollment Profile (which Congress signed) and the DC Residency Verification Form (which she did not).  Congress's arguments regarding these forms thus fail to create any suggestion of pretext that would need to be heard by the jury.

Nor does the Disciplinary Action Recommendation Form's mention of Zaki's negative evaluation of Congress, as part of one of the twelve Douglas factors, create a reasonable inference that the District terminated Congress solely because of Zaki's discriminatory animus. See Pl.'s Opp. at 6.  First, Zaki's statement was only one of twelve factors considered.  And the sections of the memo considering the appropriate sanction make no reference to it.  See Def.'s MSJ Ex. 25 at 3.  Instead, the 2014 LMER investigation and resulting termination recommendation were explicitly grounded in the findings that Congress had committed two instances of residency fraud separated by several months.  See id.  Specifically, in a section considering Congress's stated safety rationale for enrolling her daughter at Anacostia, the memo rejects that justification, stating that "[Congress's] claims of safety concerns do not explain [her] enrolling her daughter at Anacostia the *second* time, [i]n September 2012, over six months after the first time [because Congress] had ample time to seek out *alternative options*."  Id. (emphasis added).  It was thus Congress's ability to seek out "alternative options" in the interim period between the first and second residency violations that the District relied on in its termination decision, ultimately concluding that "DCPS cannot justify the Subject intentionally circumventing its rules, particularly when other options are present."  Id.  Second, any reference to Zaki's views of Congress is similarly absent from the Termination Memo sent to Congress.

See Def.'s MSJ Ex. 26 at 1.  Third, the District explicitly noted in the Disciplinary Action

Recommendation Form that "[i]n all previous cases in which an employee reported false

information in order to have his/her child registered with DCPS, the subject's employment was

terminated except in cases in which the subject resigned prior to [the] termination being

imposed."  Def.'s MSJ Ex. 25 at 2.  This past practice, which Congress does not dispute,

provides strong evidence against an inference that DCPS was improperly influenced by Zaki's

statements, particularly given that they make no reference to Congress's disability.  Again, the

question at this stage is what DCPS honestly and reasonably believed regarding the grounds for

Congress's termination, see Brady, 520 F.3d at 496.  A lone, facially nondiscriminatory

statement by Zaki cannot defeat the substantial and consistent evidence of DCPS's good faith

belief that Congress's residency fraud justified her termination.

       In sum, because Congress has failed to cast doubt on the honesty or reasonableness of

DCPS's belief that she had committed residency fraud worthy of termination, she has not raised

a genuine issue of fact as to whether that the stated reason for her termination was pretext for

disability discrimination.  The Court will thus grant summary judgment to the District on this

claim.

       B.  Count IV: Investigation and Termination for Engaging in Protected Activities

       The Rehabilitation Act makes it unlawful for employers to "discriminate against any

individual because such individual has opposed any act or practice made unlawful by this

chapter . . . ."  42 U.S.C. § 12203(a) (ADA retaliation provision); see 29 U.S.C. § 791(f)

(incorporating ADA standards in 42 U.S.C. § 12111 et seq.).  The elements of a retaliation claim

under the Rehabilitation Act require the plaintiff to show that "(1) she engaged in a protected

activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal

connection between the protected activity and the adverse action." Shinabargar v. Bd. of Trs. of Univ. of D.C., 164 F. Supp. 3d 1, 16 (D.D.C. 2016). Such claims "are subject to the same standards as Rehabilitation Act discrimination claims," including the requirement to show but-for causation. Hall, 2020 WL 5878032 at *7 (internal quotation marks omitted). Thus, "to prove the [requisite] causal connection, the plaintiff must show that the adverse action would not have occurred but for the protected activity." Id. (cleaned up); see also, e.g., Drasek v. Burwell, 121 F. Supp. 3d 143, 162 (D.D.C. 2015); Marshall v. Potter, 634 F. Supp. 2d 66, 73 (D.D.C. 2009).

Because Congress has met the requirements of a *prima facie* case and raises a genuine dispute of material fact as to whether the District's explanation for LMER's delayed commencement of its residency fraud investigation in 2014 is pretextual, the Court will deny summary judgment to the District on Congress's retaliation claim.

### 1.   *Protected activity*

"The act of requesting in good faith a reasonable accommodation is a protected activity" under the Rehabilitation Act. Solomon v. Vilsack, 763 F.3d 1, 15 (D.C. Cir. 2014). "Complaining about a failure to receive an accommodation is [also] protected activity for purposes of a [Rehabilitation Act] retaliation claim." Congress, 324 F. Supp. 3d at 175 (citing Solomon, 763 F.3d at 15–16). While the District argues that Congress cannot show she engaged in protected activity because is the record contains no written notice of her physical disabilities or requests for accommodation, the Court finds that there is sufficient evidence to permit a reasonable jury to conclude that Congress both requested such accommodations and complained to the District when she was denied them.

First, Congress testified in her deposition that she requested accommodations for her disability in the form of leave to attend doctor's appointments, access to a handicapped parking

space, use of an elevator, and assistance in dealing with emotionally disturbed students. Congress Dep. 26:2–30:9, 34:20–35:15, 36:3–22, 102:14–104:22, 103:4–15.  There is documentary evidence supporting this testimony.  As recounted above, in her September 17, 2014 email exchange with Congress, LMER representative Smith asked about Zaki's reaction to one of Congress's leave requests, see Pl.'s Opp. Ex. M at 1, an issue which Congress testified was related to her disability, see, e.g., Congress Dep. at 102:14–104:22.  And Smith's email to Zaki and Congress recounting their October 2014 mediation session notes that Congress had complained of a "reprimand that she received for leaving early" and reflects Zaki's observation that Congress "request[s] time off a lot."  Def.'s Reply Ex. 2 at 2.

Second, the above correspondence is also evidence that Congress submitted complaints to the District when she was denied leave, as LMER is the DCPS office responsible for handling claims of disability discrimination.  Def.'s MSJ Ex. 15 at 1; Wynn Dep. at 14:20–15:4, 29:3–17. Indeed, the October 2014 mediation session is itself evidence of Congress's complaints, as it took place in response to Congress's September 2014 complaint, and concerned, among other things, Congress's dissatisfaction with Zaki's leave policy.  See Def.'s Reply Ex. 2 at 1–2.

The record at summary judgment thus provides sufficient evidence for a reasonable jury to conclude that DCPS was aware of Congress's requests for leave related to her disability, that Congress lodged complaints about the DCPS's perceived failure to accommodate these requests, and therefore that Congress engaged in protected activity under the Rehabilitation Act.

## 2.  *Materially adverse action and causal connection*

As the Court previously held at the motion to dismiss stage, Congress II, 324 F. Supp. 3d at 175, the proper focus of the causation element of Congress's retaliation claim is the causal relationship between Congress's September 2014 complaints, which are protected activity, see,

e.g., Solomon, 763 F.3d at 15–16, and LMER's almost simultaneous commencement of its residency fraud investigation, see Pl. Compl. ¶94 ("Defendant 'investigated' Ms. Congress' alleged residency fraud again and then terminated because of her protected activities"). Congress therefore must show that LMER's investigation qualifies as a "materially adverse action" caused by her protected activity.

a.   Materially adverse action

In the employment discrimination context, an adverse employment action is defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing [a] significant change in benefits." Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  By contrast, "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." Baloch v. Kempthorne, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008).  Retaliation claims are "'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend" further "so long as 'a reasonable employee would have found the challenged action materially adverse.'"  Id. (quoting Burlington Northern and Santa Fe. Ry. Co. v. White, 548 U.S. 53, 64, 68 (2006).  Considering this broader sweep, the D.C. Circuit held in Velikonja v. Gonzales, 466 F.3d 122, 123–24 (D.C. Cir. 2006) (per curiam), that, where an investigation prevented a plaintiff from receiving a promotion, the plaintiff had adequately alleged an "adverse employment action" for a retaliation claim under Title VII because "a reasonable jury could find that the prospect of such an investigation could dissuade a reasonable employee from making . . . a charge of discrimination."

District courts in this circuit have followed <u>Velikonja</u> in finding that, while the "mere initiation" of an investigation is generally not sufficient to constitute adverse action for a retaliation claim, an investigation which carries the prospect of material consequences for the plaintiff may constitute adverse action.  <u>Compare, e.g.</u>, <u>King v. Holder</u>, 77 F. Supp 3d. 146, 151 (D.D.C. 2015) (internal quotation marks and citation omitted); <u>Baloch v. Norton</u>, 517 F. Supp. 2d 345, 358 (D.D.C. 2006) <u>aff'd</u> <u>Baloch</u>, 550 F.3d at 1198–99; <u>with e.g.</u>, <u>King</u>, 77 F. Supp 3d. at 151–52; <u>Harrington v. Crawford</u>, 2020 WL 1493918 at *5-6 (D.D.C. March 27, 2020).  As the Supreme Court has explained, the touchstone of material adversity in retaliation claims is deterrence, i.e., whether a particular action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington</u>, 548 U.S. at 68 (internal quotation marks and citation omitted).

The question here, then, is whether the consequences that might flow from an LMER residency fraud investigation would "dissuade a reasonable [plaintiff] from making or supporting a charge of discrimination."  <u>Id.</u> at 57.  The answer clearly is yes.  As Congress's case proved, LMER investigations of residency fraud carry the prospect of serious consequences for employees, up to termination.  <u>See</u> Def.'s MSJ Ex. 25 at 2 (noting that employees previously found violating the District's residency rules had been terminated).  As such, the commencement of the LMER investigation in 2014, over a year after the initial referral, rather than Congress's subsequent termination, constitutes the relevant adverse action for her retaliation claim.

### b.  Causal connection

Congress argues that because the LMER residency fraud investigation had sat dormant for over a year and then was reopened mere hours after she emailed with LMER representative Smith regarding her leave requests, a reasonable jury could infer that LMER began to investigate

after a lengthy period of inactivity solely because of her complaints.  While the Court rejects Congress's characterization of the investigation as having been closed and then reopened, see Section III.A.2.(a), it agrees that the circumstances surrounding the LMER investigation support an inference of causation.

First, LMER began the investigation mere hours after Congress's September 17th email exchange with the LMER representative, and less than a month after Congress filed her retaliation complaint.  This timing supports an inference of a causal link.  See Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007) (holding that where "less than a month separated" the plaintiff's action and the defendant's retaliatory action "a reasonable finder of fact could infer causation in that area without more").

Second, as LMER representative Thomas testified, commencing an investigation so long after an initial referral was abnormal.  See Thomas Dep. at 32:1–19 (stating that "[i]nvestigations were typically acted on within 24 to 48 hours" after a complaint).[6]  Such a deviation from standard employment practices can indicate improper motives.  See Walker, 798 F.3d at 1092 (describing circumstances that may undermine the employer's stated reason, including the employer's "deviation from established procedures or criteria").

Third, according to Congress, Zaki announced during their mediation session with Smith that she should be investigated for residency fraud.  Congress Dep. at 128:14–128:18.  This

_____

[6] While Wynn testified in her deposition that disciplinary actions resulting from residency fraud sometimes took "months" or "years," she clarified that the delay she was describing was the time between the investigation's findings and any resulting disciplinary action, not between the initiation of the investigation and the actual investigatory tasks.  Wynn Dep. at 77:20–78:11.  Such a timeline is fully consistent with the LMER's actions once it started investigating here, as the substance of Lee's investigation took place in November 2014, Def.'s MSJ Ex. 22 at 3, while Congress was only subject to disciplinary action in April 2015, Def.'s MSJ Ex. 26 at 1-3.  Nothing in Wynn's testimony on this point contradicts Thomas's description of LMER's typical practice of quickly investigating residency fraud complaints. See Thomas Dep at 32:1–19.

statement, which was memorialized in Congress's written submission to Lee during the course of his investigation, Def.'s MSJ Ex. 22 at 5–6, might reasonably suggest that Zaki played a role in kickstarting LMER's investigation.[7]

Considering all of this evidence, the record is sufficient to permit a reasonable jury to conclude that the 2014 LMER investigation was motivated by retaliatory animus.

### 3. *Legitimate non-retaliatory reason*

In addition to challenging the causation element of Congress's *prima facia* case, the District offers a legitimate, non-retaliatory explanation for the delayed commencement of the LMER investigation.  It maintains that employee turnover in LMER's investigative division caused Congress's case to simply slip through the cracks.

The District's explanation finds some support in the record.  Wanda Malloy—the LMER official in charge of employee misconduct investigations who was originally tasked with collaborating with Wynn—left LMER sometime in 2013 without ever meeting with Wynn. Wynn Dep. at 28:18–22, 31:9–32:7, 49:7–12; Def.'s MSJ Ex. 16 at 1.  Her replacement, Daniel Ellis, served until July 2014, at which point he left LMER and Robert Thomas began as head of investigations.  Thomas Dep. at 11:2–13:2.  Given this series of events, it is certainly plausible that repeated staffing changes explain why the investigation into Congress's conduct stalled.

But plausibility is not enough to earn summary judgment; the employer is required to show that there is no genuine dispute of material fact as to its explanation.  See Fed. R. Civ. P. 56(a).  The District cannot meet this burden here.  As recounted above, Congress has brought

---

[7] Notably absent from the summary judgment record is any other evidence concerning whether Zaki communicated with Smith or anyone else at LMER about commencing another investigation of Congress.  Such evidence (or lack thereof) would appear to be highly relevant to the question of causation were the case to proceed to trial.

forth evidence of the possible retaliatory motive behind the commencement of the LMER investigation in the form of Zaki's statements, the deviation from the District's typical practice of promptly investigating and processing complaints of employee misconduct, and the temporal proximity of her complaints.  Based on this evidence, a reasonable jury could conclude that LMER's  investigation was prompted by Congress's complaints.  Accordingly, the Court finds that Congress has raised a genuine issue of material fact as to whether the District's non-retaliatory explanation for the investigation is pretextual and will deny summary judgment to the District on this claim.

## IV.   Conclusion

For the reasons stated above, the Court will grant the District's Motion for Summary Judgment as to Congress's disability discrimination claim (Count III) and deny its motion for summary judgment as to Congress's retaliation claim (Count IV).  A separate order follows.

Date:  <u>December 18, 2020</u>                                    _____
                                                                                        CHRISTOPHER R. COOPER
                                                                                        United States District Judge